936 F.2d 1027
 59 Fair Empl.Prac.Cas. 1854,
57 Empl. Prac. Dec. P 40,984, 18 Fed.R.Serv.3d 322
 Jesse J. SANCHEZ; Victor Torres; Robert Caro, Plaintiffs-Appellants,
v.
CITY OF SANTA ANA; City of Santa Ana Police Department;
Don Botts; Raymond C. Davis; E.B. Hansen; Robert
Stebbens; Norwood Williams; Lee Drummond; Lawrence
Pitzer; Michael Lewellen; Dale Sterzer; Gary Dixon; John
Collins; John McDaniels; Michael Lanners; William Bruns;
John Dittus; Richard Faust; John McClain, Defendants-Appellees.
 Nos. 85-6504, 86-6226, 87-5614 and 88-5853.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 4, 1989.
Decided July 11, 1990.
As Amended on Denial of Rehearing
and Rehearing En Banc Feb. 27,
and May 24, 1991.
 
 Meir J. Westreich, Glendale, Cal., for plaintiffs-appellants.
 Charles Matheis, Jr., Santa Ana, Cal., Larry J. Roberts, Gregory G. Petersen, Petersen & Trott, Orange, Cal., Daniel F. Fears, Paul, Hastings, Janofsky & Walker, Costa Mesa, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before GOODWIN, Chief Judge, SCHROEDER and O'SCANNLAIN, Circuit Judges.
 GOODWIN, Chief Judge:
 
 
 1
 Jesse J. Sanchez, Victor Torres, and Robert Caro, former police officers of the Santa Ana Police Department (SAPD), appeal district court judgments in their action against the City of Santa Ana, and various Police Captains, Lieutenants and Sergeants, for alleged deprivation of rights secured by the first and fourteenth amendments, in violation of 42 U.S.C. Secs. 1981, 1983, 1985, 1986, and alleged employment discrimination by the City of Santa Ana in violation of 42 U.S.C. Secs. 1981, 1983, 2000e-2(a). The City of Santa Ana also appeals. That appeal is addressed in Sanchez v. City of Santa Ana, 915 F.2d 424 (9th Cir.1990).
 
 
 2
 Between 1975 and 1978, the number of Hispanic police officers at the SAPD greatly increased as a result of a Bilingual Lateral Transfer Program designed to encourage Spanish-speaking officers from other California police departments to transfer to the SAPD. See generally League of United Latin Am. Citizens (LULAC) v. City of Santa Ana, 410 F.Supp. 873 (C.D.Cal.1976) (finding SAPD hiring practices unconstitutional and instituting a hiring order to remedy past practices of discriminatory hiring).
 
 
 3
 In November 1977, 100 of 225 SAPD officers took a written examination to become Sergeant. Following the examination, the City Personnel Department proposed that the passing score be adjusted to enable more Hispanic officers to pass the written examination and become eligible to compete in the oral examination for the position of Sergeant. The chief of police did not support the proposal. It was not implemented.
 
 
 4
 In December 1978, Sanchez, who was hired pursuant to the Bilingual Lateral Transfer Program, observed on the roll call board a cartoon he considered to be racially offensive. Sanchez took a copy of the cartoon to the City Personnel Department. The police chief punished those involved in disseminating the cartoon. Sanchez also received an official reprimand for violating the chain of command by bringing the cartoon to the attention of the City Personnel Department, rather than the proper SAPD officials.
 
 
 5
 On January 9, 1978, Sanchez, Caro and Torres, together with other members of the SAPD, chartered an Orange County chapter of the Latino Peace Officers Association (LPOA), with Caro as president and Torres as vice-president. At a January 13, 1978 meeting between Chief Davis and minority officers, Caro, on behalf of the LPOA, presented Chief Davis with a packet of materials detailing racial problems with the SAPD (the "LPOA packet"). Pursuant to Chief of Police Davis's instructions, Lieutenant Salazar and Lieutenant Lewellen were assigned to investigate the allegations as well as the cartoon incident. The lieutenants prepared a report for Chief Davis. The report found no racial problems, noted some isolated incidents of offensive language, and characterized some minority officers as "super-sensitive."
 
 
 6
 According to the plaintiffs, during the next few months, LPOA members became targets of selective enforcement of SAPD rules and of peer ostracism. They also claim that various defendants made racially offensive slurs. The complaints alleged that LPOA members resigned from the organization because of their fears of ostracism and discrimination by defendants. Plaintiffs also alleged that unsafe vehicles were assigned to LPOA members and that they did not receive adequate police back-ups during certain operations. Sanchez and Torres claim that secret and illegal personnel files were kept on them by various defendant-supervisors.
 
 
 7
 On January 13, 1978, Caro complained to Lieutenant Williams, his supervisor, that Bannon, an Anglo officer, used unnecessary force during an arrest. The allegations prompted an investigation by Bannon's supervisor, Lieutenant Dixon, but no charges resulted. Caro complained to Lieutenants Williams and Jordan, Sergeants Dittus, and Garza (the Affirmative Action Officer), that Dixon was biased.
 
 
 8
 Following the investigation, Chief Davis terminated Caro's employment on the ground that his allegation against Bannon was unfounded and made with evil intent. The termination statement also said that Caro was untruthful during the subsequent investigation. Despite Caro's contention that the investigation was biased and hostile to him, due to his involvement with the LPOA, the termination was upheld by the Santa Ana Personnel Board, the California Superior Court, and the California Court of Appeals.
 
 
 9
 Following Caro's discharge, Torres made a public statement regarding continued discrimination at the SAPD. Although he was not formally reprimanded, Torres was reminded of his duty to present discrimination claims within the SAPD before airing his grievances to the public.
 
 
 10
 In January of 1978, Torres applied for the position of Assistant Team Leader (ATL) for the patrol division, and, based on his 1977 test scores, he was next in line for the position. The list expired, however, and in March of 1978, Torres submitted his application to an ATL oral board (Lieutenants Lewellen and Sterzer and Sergeant Bruns). Torres testified that he was questioned about and orally reprimanded for his involvement with the LPOA and the LPOA packet. Torres never became an ATL.
 
 
 11
 In September of 1978, Torres requested a leave of absence to attend to his ill parents. His request was denied. Torres then appealed and was granted a one-week leave. At the end of the week he voluntarily resigned from the SAPD. In an April, 1979 letter to Personnel Director Botts, Torres stated that he resigned to assist his parents. Torres now claims, however, that he was constructively discharged as a result of racial discrimination.
 
 
 12
 In March of 1979, Sanchez also resigned from the SAPD. He claims that he was constructively discharged following the removal of his merit pay. See Sanchez, at 427.
 
 
 13
 On May 18, 1979, Sanchez, Torres and Caro filed a complaint seeking damages and injunctive relief for violations of their civil rights.[1] Plaintiffs moved for full discovery of SAPD personnel files and the defendants sought a protective order to limit plaintiffs' discovery. The court granted the protective order in part, limiting plaintiffs' discovery to (1) statistical data, compiled by the SAPD, regarding the number of full-time, permanent members of the SAPD who were discharged or who resigned while under investigation, between February 1973 and July 1979 and (2) comparative data regarding the compensation of members of the SAPD between May 1975 and July 1979, with no identification of individual members beyond ethnic and sex classifications. The court's grant of the protective order was without prejudice to the plaintiffs' moving for production of the protected material if the action were certified as a class action. The plaintiffs thereafter moved for class certification on behalf of all Hispanic officers, pursuant to Fed.R.Civ.P. 23(b)(1), (b)(2), which the district court denied on February 26, 1980.
 
 
 14
 Defendants moved to dismiss or in the alternative for summary judgment or partial summary judgment. Partial summary judgment was granted to defendants as to (1) all issues concerning defendants' hiring practices; (2) Sanchez's complaints based on his failure to get Crime Scene Investigator pay; (3) Torres's claim of discrimination for failure to promote him to Sergeant; and (4) all generalized claims of a disparate impact from disciplinary proceedings being more frequent towards Hispanics than others. Defendants were also granted partial summary judgment as to all of Caro's pre-termination claims. Caro's pre-termination claims were precluded by his state proceedings, but Caro's post-termination claims were preserved.
 
 
 15
 Sanchez was granted summary judgment against the City of Santa Ana on his claim of denial of due process in removal of his merit pay, but was denied summary judgment on his first amendment discriminatory retaliation claim. Following thirty-nine days of trial, a verdict was directed in favor of the defendants on all remaining claims. The court, as noted in the companion appeal, referred Sanchez's claims for damages to the jury.
 
 
 16
 The City moved for judgment notwithstanding the verdict or for a new trial and both motions were denied. The defendants' motions for attorney's fees were granted and defendants were awarded $471,558.71. Sanchez's motion for determination of prevailing party status was granted on his due process claim but denied on his other claims; he was denied attorney's fees and costs.
 
 JURISDICTION
 
 17
 All but five of the defendants[2] contend that this court lacks jurisdiction over this appeal because the district court improperly vacated Fed.R.Civ.P. 54(b) certification of the final directed verdict judgments, and the plaintiffs did not timely appeal from the certified judgment. We reject this contention.[3]
 
 
 18
 In directing a verdict on most of the plaintiffs' claims, the district court ordered the defendants to prepare a judgment in conformance with the directed verdict. There is no indication in this order that the court directed the judgment to be certified under Fed.R.Civ.P. 54(b).[4]
 
 
 19
 On December 4, 1985, the defendants filed a proposed judgment reciting that there was no just reason for delay, and directing that judgment be entered forthwith pursuant to Rule 54(b). The district court entered the judgment and served it on all the parties. It is undisputed that the plaintiffs failed to file a notice of appeal within thirty days of this judgment, as required by Fed.R.App.P. 4.
 
 
 20
 At a hearing on February 24, 1986, the plaintiffs argued that the December 5, 1985 judgment was not appealable because the district court had not intended to certify the judgment under Rule 54(b). The plaintiffs reminded the court that on December 9, 1985, four days after entry of judgment, the court had indicated that it intended there be only a single, final judgment from the case. At a March 10, 1986 hearing on the plaintiffs' motion to correct the judgment, the court stated that it never intended to certify the judgment under Rule 54(b) and vacated the 54(b) certification.
 
 
 21
 Fed.R.Civ.P. 60(a) provides that clerical mistakes in judgments arising from oversight or omission may be corrected by the court at any time on its own initiative or on the motion of any party and after such notice, if any, as the court orders. "The error can be corrected whether it is made by a clerk or by the judge." Blanton v. Anzalone, 813 F.2d 1574, 1577 (9th Cir.1987).
 
 
 22
 In deciding whether the district court may alter a judgment pursuant to Rule 60(a), our focus is on what the court originally intended to do. Id. Rule 60(a) is limited, however, to correcting errors "arising from omission" and may not be used to correct more substantial errors, such as errors of law. Waggoner v. R. McGray, Inc., 743 F.2d 643, 644 (9th Cir.1984) (per curiam).
 
 
 23
 The situation here falls under Rule 60(a). The district judge stated on the record that he never intended to grant 54(b) certification. We find no reason to doubt the district judge's statements, particularly in light of his failure to direct the defendants to include 54(b) certification in the final judgment he asked them to prepare. See Blanton, 813 F.2d at 1577. Accordingly, the error arose from oversight or omission and was within the district court's power to correct under 60(a). See Waggoner, 743 F.2d at 644.[5]
 
 PROTECTIVE ORDER
 
 24
 Plaintiffs claim that the district judge improperly issued a protective order denying them discovery of SAPD personnel files and allowing limited discovery of SAPD compiled statistical data. Defendants correctly argue that the protective order was proper because of the confidential nature of the requested files.
 
 
 25
 Federal Rule of Civil Procedure 26(c) provides that a court may limit discovery to protect from annoyance, embarrassment, oppression, or undue burden or expense. Federal common law recognizes a qualified privilege for official information. Kerr v. United States Dist. Ct. for N.D. Cal., 511 F.2d 192, 198 (9th Cir.1975), aff'd, 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). Government personnel files are considered official information. See, e.g., Zaustinsky v. University of Cal., 96 F.R.D. 622, 625 (N.D.Cal.1983), aff'd, 782 F.2d 1055 (9th Cir.1985). To determine whether the information sought is privileged, courts must weigh the potential benefits of disclosure against the potential disadvantages. If the latter is greater, the privilege bars discovery. Jepsen v. Florida Bd. of Regents, 610 F.2d 1379, 1384-85 (5th Cir.1980); Zaustinsky, 96 F.R.D. at 625.
 
 
 26
 The relevance of plaintiffs' discovery request for employment data is undisputed. Most of the relevant information, however, could have been developed by interrogatories. It is well-settled that an employee may prove his or her claim of unlawful discrimination by evidence that other employees of different races or national origin were treated differently in similar circumstances. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-805, 93 S.Ct. 1817, 1825-1826, 36 L.Ed.2d 668 (1973); Diaz v. American Telephone & Telegraph, 752 F.2d 1356, 1362-63 (9th Cir.1985). Statistical evidence alone may make out a prima facie case of unlawful discrimination. Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989).
 
 
 27
 Plaintiffs seek more than statistical data of officer employment termination, discipline and compensation. They demanded access to the SAPD's personnel files to compile their own statistics. While these files are not absolutely privileged, the confidential nature of the employee personnel files suggests that opening the files to the plaintiffs for a general search could reach well beyond the legitimate inquiries necessary to this litigation and would impact disciplinary procedures within the SAPD. The SAPD claims that the files contain additional confidential information that is irrelevant to plaintiffs' suit.
 
 
 28
 The district court did not abuse its discretion in denying access to these files. See Ah Moo v. A.G. Becker Paribas, Inc., 857 F.2d 615, 619 (9th Cir.1988). While plaintiffs demonstrate the relevance of statistics to their suit, they fail to show that discovery of the actual files was necessary. Focused discovery could have been employed. Plaintiffs accuse the defendants of inaccurate statistical conclusions, but they were free to utilize the statistics to draw their own conclusions. In addition, the plaintiffs had access to the same EEOC data from which the SAPD's expert compiled the statistics in question, and, when investigating a charge, the EEOC has "a broad right of access to relevant evidence." University of Pa. v. Equal Employment Opportunity Commission, 493 U.S. 182, 110 S.Ct. 577, 583, 107 L.Ed.2d 571 (1990) (citing 42 U.S.C. Sec. 2000e-8(a)). The SAPD's expert did not draw conclusions from the files themselves but from the EEOC data. Plaintiffs have not alleged that the EEOC data is biased or that they were denied access to this data. They fail to show prejudice from the denial of their full discovery request.
 
 SUMMARY JUDGMENT ON PAY AND PROMOTION CLAIMS
 
 29
 Plaintiffs claim that the SAPD's promotion policies, which require officers to be employed by the SAPD for a certain period of time before they can be eligible for promotions, have a discriminatory impact on Hispanic officers hired laterally from other police departments.[6] Plaintiffs challenge the district court's finding that these pay and promotion claims were governed by LULAC, 410 F.Supp. 873 (C.D.Cal.1976). We agree that the district court misapplied LULAC.
 
 
 30
 In LULAC the district court held that the City of Santa Ana engaged in discriminatory hiring practices that resulted in disproportionally few Mexican-American police or firemen. 410 F.Supp. at 911-12. The suit was brought in 1974 by a rejected Hispanic police applicant and by the League of United Latin American Citizens on behalf of its members. Finding unlawful discrimination, the district court also mandated that a preferential hiring order be instituted in future proceedings. Id. at 911. The district court in the instant case held that LULAC governed "all aspects of lateral transfers including credits, salary and classification." (emphasis added). LULAC, however, makes no mention of the City's policies on lateral hiring or potential discrimination that may result from those policies. LULAC only addresses hiring policies for new applicants to the police force. Moreover, the bilingual lateral transfer program began in 1974-75 following the initiation of the LULAC suit. Because the district court erroneously applied LULAC we reverse the district court's grant of summary judgment on this issue and remand for consideration of the plaintiffs' claim.
 
 
 31
 SUMMARY JUDGMENT ON OTHER DISPARATE IMPACT CLAIMS
 
 
 32
 Plaintiffs alleged that the defendants enforced City and department regulations in a racially and ethnically discriminatory fashion. On the basis of the defendants' statistical data, which did not reveal any discrimination, the district court granted summary judgment to defendants on all generalized claims of disparate impact from disciplinary proceedings.
 
 
 33
 On appeal, plaintiffs challenge this summary judgment because they were denied equal access to personnel files which they claim would have allowed them to compile contradictory statistics and challenge defendants' evidence. As discussed previously, this claim has no merit.
 
 DENIAL OF CLASS CERTIFICATION
 
 34
 Sanchez, Torres, and Caro brought this action as individuals and as a class on behalf of all Spanish-surnamed individuals employed by the City as police officers, past, present and future, pursuant to Fed.R.Civ.P. 23(a), (b)(1), (b)(2). The district court denied class certification primarily upon a finding that the three no-longer-employed plaintiffs failed to meet the commonality and typicality requirements of Fed.R.Civ.P. 23(a)(2) & (3). This ruling is correct.
 
 
 35
 On appeal plaintiffs argue that the denial of equal access to the personnel files prevented them from specifically alleging commonality or typicality. As previously noted, this claim has no merit and the district court did not abuse its discretion in refusing to certify this class. See Caldeira v. County of Kauai, 866 F.2d 1175 (9th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 69, 107 L.Ed.2d 36 (1989); Probe v. State Teachers' Retirement Sys., 780 F.2d 776, 779 (9th Cir.), cert. denied, 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986).
 
 CARO'S PRE-TERMINATION CLAIMS
 
 36
 Caro claims that the district court erred in granting summary judgment to defendants on his pre-termination claims based on a finding that the claims were barred by res judicata. We affirm the district court.
 
 
 37
 Following Caro's termination from the SAPD, he appealed the dismissal to the Personnel Board of the City of Santa Ana seeking a reversal and reinstatement. The Personnel Board denied his requests, and Caro instituted an action in the California Superior Court seeking the same relief. He lost in the Superior Court and appealed to the Court of Appeals where he also lost. The Court of Appeals specifically found that Caro was afforded a full and fair hearing at the Personnel Board and that there was no bias or prejudice, racial or otherwise, involved in, or causing his discharge. The court also held that there were no due process violations. In response to the res judicata defense in the district court, Caro argued that the defendants conspired to obstruct justice and deter witnesses who might have testified on his behalf in violation of 42 U.S.C. Sec. 1985(2).
 
 
 38
 It is well-established that where a federal constitutional claim is based on the same asserted wrong as a state action and the parties are the same, res judicata will bar the federal constitutional claim, whether or not it was asserted specifically in state court. 28 U.S.C. Sec. 1738 (1982); Trujillo v. County of Santa Clara, 775 F.2d 1359, 1363 (9th Cir.1985); Scoggin v. Schrunk, 522 F.2d 436, 437 (9th Cir.1975), cert. denied, 423 U.S. 1066, 96 S.Ct. 807, 46 L.Ed.2d 657 (1976).
 
 
 39
 In California, to whose law we must look for the applicable res judicata and collateral estoppel principles, Punton v. City of Seattle, 805 F.2d 1378, 1380 (9th Cir.1986), cert. denied, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 527 (1987), res judicata precludes a plaintiff from litigating a claim if the claim "relates to the same 'primary right' as a claim in a prior action, the prior judgment was final and on the merits, and the plaintiff was a party or in privity with a party in the prior action." Trujillo, 775 F.2d at 1366 (citing Slater v. Blackwood, 15 Cal.3d 791, 795, 543 P.2d 593, 594, 126 Cal.Rptr. 225, 226 (1975)). Caro's claim was based upon the same due process rights, the state court's judgment was final, and he was a party to the action. Moreover, he could have raised the specific allegation of conspiracy to obstruct justice in his state court proceedings.
 
 
 40
 Caro argues that he was not afforded a full and fair opportunity to litigate the claim in the state court and, accordingly, he should not be barred from litigating his pre-termination claims in federal court. We reject this contention.
 
 
 41
 Collateral estoppel does not apply when the party against whom it is asserted did not have a "full and fair opportunity" to present the case. Kremer v. Chemical Constr., 456 U.S. 461, 480-81, 102 S.Ct. 1883, 1896-98, 72 L.Ed.2d 262 (1982); Allen v. McCurry, 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). The Supreme Court has stated, however, that "state proceedings need do no more than satisfy the minimum procedural requirements of the fourteenth amendment's due process clause in order to qualify for the full faith and credit guaranteed by federal law." Kremer, 456 U.S. at 481, 102 S.Ct. at 1897. Caro claims that Community Service Officer Christine Schuller was intimidated by various defendants and as a result would not testify on his behalf. He failed, however, to produce proof of that assertion. Moreover, Caro does not claim, and we do not find, that the California courts violated minimum standards of due process.
 
 
 42
 Caro also contends that issue and claim preclusion should not apply to claims brought under 42 U.S.C. Sec. 1985(2). While the Supreme Court has not stated specifically that claim and issue preclusion principles apply to section 1985(2) conspiracy claims, it has held these principles applicable to Title VII and section 1983 suits. See Migra v. Warren City School Dist. Bd. of Ed., 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (state preclusion law applies to section 1983 claims); Kremer, 456 U.S. at 461, 102 S.Ct. at 1883 (claim and issue preclusion apply to Title VII actions). Moreover, in Rutledge v. Ariz. Bd. of Regents, 660 F.2d 1345 (9th Cir.1981), aff'd, Kush v. Rutledge, 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983) we afforded full faith and credit to state judicial proceedings involving an athlete's claim that he was assaulted by his coach and that the team engaged in a cover-up of the incident in violation of section 1985(2). Likewise, we conclude that Caro's claim that justice was obstructed during the Personnel Board and state court proceedings is barred.
 
 DIRECTED VERDICTS
 
 43
 Following the completion of the plaintiffs' oral presentation of evidence, defendants were granted directed verdicts on all remaining claims. Plaintiffs appeal the verdicts on the following claims: (1) The existence of a racially discriminatory atmosphere; (2) The unlawful retaliation against the plaintiffs for engaging in protected speech; (3) The discrimination and retaliation based on race and national origin; and (4) The conspiracies against plaintiffs due to their exercise of first amendment rights, their race and national origin, and defendants' obstruction of justice.
 
 A. Discriminatory Environment
 
 44
 Plaintiffs allege the existence of a racially discriminatory atmosphere at the SAPD in violation of 42 U.S.C. Sec. 1981 and Title VII, 42 U.S.C. Sec. 2000e. They claim that enough evidence was presented that a reasonable jury could have found the existence of a hostile work environment.... This is a mischaracterization of the record. We affirm judgment to the defendants.
 
 
 45
 Plaintiffs do not distinguish between their causes of action under section 1981 and Title VII. They contend that parallel claims under section 1981 and Title VII should be assessed by like standards. The Supreme Court has stated, however, that while there is a "necessary overlap" between these two statutes, section 1981 does not apply to post-contract formation conduct unrelated to an employee's right to enforce his or her contract. Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 2374-75, 105 L.Ed.2d 132 (1989). Title VII, on the other hand, applies to racial harassment in the course of employment. See id., 109 S.Ct. at 2374; Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-66, 106 S.Ct. 2399, 2404-2405, 91 L.Ed.2d 49 (1986) (Court discusses Title VII's application to sexual harassment). Because plaintiffs' hostile atmosphere claim does not involve specific allegations of a refusal to make a contract or the impairment of their ability to enforce contract rights, it should be analyzed under Title VII. Patterson, 109 S.Ct. at 2374.[7]
 
 
 46
 In the district court's pretrial order, it was agreed that Title VII claims would not be tried by a jury. We have held that a jury trial need not be provided in Title VII cases. See Slack v. Havens, 522 F.2d 1091, 1094 (9th Cir.1975); cf. Miller v. Fairchild Indus., Inc., 885 F.2d 498, 507 (9th Cir.1989) (where plaintiff brings an equitable discrimination claim under Title VII and a legal claim under section 1981 based on the same facts, the trial judge must follow the jury's factual findings), cert. denied, --- U.S. ----, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990). Accordingly, even if plaintiffs' discriminatory atmosphere claim is meritorious, we may not remand it for a jury determination.
 
 
 47
 In moving for a directed verdict, the defendants did not distinguish between plaintiffs' Title VII and 1981 claims. Likewise, in directing a verdict the district court did not make this distinction. The court found simply that "no reasonable person could find for the plaintiffs." In our review, however, we must make this distinction. We are not deciding whether the district court improperly took the issue away from the jury, but whether the district court erred in deciding the issue without hearing from the defense.
 
 
 48
 Federal Rule of Civil Procedure 41(b) allows the district judge presiding over a bench trial to decide the case following the close of the plaintiffs' case. In Johnson v. United States Postal Service, 756 F.2d 1461, 1464 (9th Cir.1985), we held that a district court's factual findings made pursuant to Rule 41(b) should be reviewed under the clearly erroneous standard. We also held that ultimate findings under Rule 41(b) are mixed questions of law and fact and are reviewed de novo. Id. at 1465. While the defendants did not make a Rule 41(b) motion, their motion for a directed verdict at the close of plaintiffs' case on an issue that will ultimately be decided by the judge has the same effect. Accordingly, we adopt the same standard of review.
 
 
 49
 We cannot say that the district court's ultimate conclusion, that the plaintiffs failed to prove the existence of a discriminatory atmosphere, is incorrect as a matter of law. The "directed verdict" is affirmed.
 
 B. First Amendment Claims
 
 50
 Sanchez and Torres allege that they were unlawfully retaliated against for exercising their first amendment rights in violation of 42 U.S.C. Sec. 1983. Our review of the record indicates that reasonable jurors could find retaliation on one or more of these claims. These claim are remanded for jury consideration of the potential liability of Chief Davis, Captains Hansen and Stebbens and Lieutenant Williams to Sanchez,[8] and the potential liability of Lieutenants Lewellen, Sterzer and Pitzer and Sergeant Bruns to Torres. The directed verdicts in favor of the City and the remaining defendants are affirmed. The specific instances testified to do not impose liability upon the City for the alleged retaliation by individual officers. Public entities are liable under section 1983 only when the constitutional violation occurs as a result of a policy or custom. Monell v. New York City Dep't of Social Services, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978); City of St. Louis v. Praprotnik, 485 U.S. 112, 122-23, 108 S.Ct. 915, 923-24, 99 L.Ed.2d 107 (1988). Plaintiffs failed to prove the existence of such a policy or custom.
 
 
 51
 "To make out a cause of action under section 1983, plaintiffs must plead that (1) the defendants acting under color of state law (2) deprived plaintiffs of rights secured by the Constitution or federal statutes." Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1313-14 (9th Cir.1989) (quoting Gibson v. United States, 781 F.2d 1334, 1338 (9th Cir.1986), cert. denied, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987)). A violation of section 1983 occurs where an employee is wrongfully retaliated against for speech protected by the first amendment. See Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Pickering v. Board of Educ. of Township High School Dist. 205, Will County Ill., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Allen v. Scribner, 812 F.2d 426 (9th Cir.), amended, 828 F.2d 1445 (1987).
 
 
 52
 To make a successful claim for wrongful retaliation under the first amendment and section 1983, the plaintiff must prove that: (1) the statement that brought on the retaliation is one of "public concern;" (2) the constitutionally protected expression is a "substantial" or "motivational" factor in the employer's adverse decision or conduct; and (3) the interests of the plaintiff/employee in commenting on the matter of public concern outweigh the state's interest in maintaining efficient public services. See Allen, 812 F.2d at 430-32. The defendants concede or do not contest that the incidents alleged by Sanchez and Torres are protected under the first amendment.
 
 
 53
 Sanchez and Torres testified to numerous instances that a reasonable jury could have found to be unconstitutional retaliation. Plaintiffs testified that the above identified defendants reacted adversely to the formation of the LPOA, the LPOA meeting with city personnel, the submission of the LPOA packet, the filing of EEOC complaints, the instigation of legal activity, Torres's press conference, and Sanchez's and Torres's public support of Caro following his discharge. Moreover, both Sanchez and Torres testified to being ostracized and victims of a "silent treatment" and of selective enforcement of the rules, and Torres claimed that he was penalized in his interview for the ATL position and received poor reviews. These claims of first amendment retaliation are therefore remanded for submission to the jury. Sanchez and Torres are entitled to a jury determination of whether the first amendment has been violated, and by whom, and what damages, if any, would be required to repair any injuries caused by the alleged retaliation.
 
 
 54
 The evidence, however, does not support a claim that the SAPD's policy of bringing grievances to authorities in the SAPD before bringing them to the City or the public, was unreasonable as to Sanchez. The Supreme Court has held that a public employer can impose reasonable limitations on the manner that employer grievances are handled. Connick, 461 U.S. 138, 103 S.Ct. 1684. "The problem ... is to arrive at a balance between the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting efficiency of the public service it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734.
 
 
 55
 In applying this test, we have held that a police department has a great interest in protecting itself from false and unfavorable publicity generated by its employees. Allen, 812 F.2d at 432; Byrd v. Gain, 558 F.2d 553, 554 (9th Cir.1977) (court refuses to expunge reprimands from personnel files of officers who issued public statements about the police department's stop and frisk tactics), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). The SAPD's policy of bringing grievances first through appropriate channels to authorities in the department before bringing them to the City or the public is reasonable and not arbitrary. There was no constitutional violation in requiring officers to communicate "through channels" before enlisting public opinion to their cause.
 
 C. Discrimination/Retaliation
 
 56
 All three plaintiffs claim that substantial evidence was presented to sustain their allegations that the defendants violated sections 1981, 1983, and Title VII by retaliating against them because of their race. Their claims are founded on the fourteenth amendment's equal protection and due process clauses. This directed verdict is affirmed. Caro's claims are barred. Sanchez received favorable verdicts from the jury on his separate fourteenth amendment due process claim.[9] There is no evidence to support Torres's claims; his grievances are best addressed under the first amendment analysis discussed previously.
 
 D. Conspiracies
 
 57
 Plaintiffs claim that substantial evidence supports the inference of a single conspiracy managed and implemented by Chief Davis and Captain Hansen and involving all other defendants. They allege the same incidents of first amendment protected activities to support their conspiracy claim under section 1983. While we agree that enough evidence exists to reverse many of the directed verdicts, we do not find evidence to support a conspiracy claim under 42 U.S.C. Sec. 1983.
 
 
 58
 Plaintiffs also claim that the defendants conspired to obstruct justice by deterring witnesses from testifying on behalf of Caro and by presenting false evidence at Caro's termination hearing depriving them of equal protection under the law in violation of 42 U.S.C. Secs. 1985(2), 1986. This claim is meritless.
 
 
 59
 Section 1985 proscribes conspiracies to interfere with civil rights. A claim brought under the first and second clauses of section 1985(2) requires a direct or indirect purpose to deprive any persons of the equal protection of the laws, or the equal privileges or immunities under the laws and a class race-based animus. See Kush, 460 U.S. at 719, 103 S.Ct. at 1483; Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); Bretz v. Kelman, 773 F.2d 1026, 1028 (9th Cir.1985) (en banc). To be actionable, the conspiracy must result in overt acts, done in furtherance of the conspiracy, that are both the cause in fact and proximate cause of plaintiffs' injuries. See Arnold v. IBM, 637 F.2d 1350, 1355 (9th Cir.1981). A mere allegation of conspiracy without factual specificity is insufficient to support a claim. Karim-Panahi v. Los Angeles Police Dept., 839 F.2d 621, 626 (9th Cir.1988).
 
 
 60
 Plaintiffs allege the required class--Hispanic police officers--but their evidence of a conspiracy to obstruct justice aimed at the class is lacking. The basis of their claim is that state court proceedings were obstructed when defendants allegedly intimidated Officer Schuller from testifying on Caro's behalf. As noted above, this claim is barred by res judicata. Moreover, defendants have presented uncontroverted evidence that Schuller refused to testify of her own free will.
 
 
 61
 Plaintiffs also claim that Officer Fernandez was influenced to suppress evidence that Sergeant Dixon, who originally investigated Caro's complaint against Officer Bannon, was hostile to Caro. Plaintiffs presented evidence that Fernandez lied to the Personnel Board about his knowledge of Sergeants Dixon's potential bias. Even viewing this evidence in Caro's favor, however, one incident does not amount to substantial evidence of a conspiracy to obstruct justice directed at the class of Hispanic police officers.[10]
 
 
 62
 Likewise, plaintiffs' claim against the individual defendants under section 1986 is meritless. "Section 1986 imposes liability on every person who knows of an impending violation of section 1985 but neglects or refuses to prevent the violation." Karim-Panahi, 839 F.2d at 626. A violation of section 1986 thus depends on the existence of a valid claim under 1985. Id.; Trerice v. Pedersen, 769 F.2d 1398, 1403 (9th Cir.1985); Mollnow v. Carlton, 716 F.2d 627, 632 (9th Cir.1983), cert. denied, 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 126 (1984).
 
 INDIVIDUAL LIABILITY ON REMAND
 
 63
 The individual defendants contend that they are immune from liability. We address their claim to guide the district court upon remand, and hold that the district court erred in ruling that the defendants were entitled to immunity because the law in this area was insufficiently clear. On remand, however, the court should also consider whether any of the defendants were performing discretionary functions and enjoyed qualified immunity for their actions on that basis.
 
 
 64
 Government officials performing discretionary functions enjoy qualified immunity from liability for civil damages as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Good faith qualified immunity attaches if the official's conduct is objectively reasonable "as measured by reference to clearly established law." Id. See also Anderson v. Creighton, 483 U.S. 635, 639-40, 107 S.Ct. 3034, 3038-39, 97 L.Ed.2d 523 (1987) (the contours of the right must be sufficiently clear to a reasonable official so that the actor would have understood that what he was doing violated that right).
 
 
 65
 The causes of action upon which we reverse the directed verdict involve particular rights that were clearly established at the time of the alleged incidents. See Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("for at least 15 years, it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interests in freedom of expression."); Gutierrez v. Municipal Ct. of Southeast Judicial Dist., Los Angeles County, 838 F.2d 1031, 1050-51 (9th Cir.1988) (governmental officials are not entitled to qualified immunity from a section 1981 or section 1983 action based on intentional discrimination), vacated on mootness grounds, 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989); Flores v. Pierce, 617 F.2d 1386, 1392 (9th Cir.) ("[n]o official can in good faith impose discriminatory burdens on a person or group by reason of a racial or ethnic animus against them. The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it."), cert. denied, 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980); Rogers, 454 F.2d at 238 (racially discriminatory atmosphere claim is actionable under Title VII).
 
 ATTORNEY'S FEES
 
 66
 Upon post-trial motion, the Sergeant-defendants and the other nine individual defendants were awarded attorney's fees under 42 U.S.C. Sec. 1988. Plaintiffs challenge these awards.
 
 
 67
 The district court found that the plaintiffs abused the legal process and dragged innocent individuals through the court system. Plaintiffs contend that, because many of the defendants' motions for summary judgment were denied, their claims have merit and attorney's fees were improperly awarded against them. Both sides claim too much from the record. Court time was wasted by both sides, some of it on groundless claims by plaintiffs, some of it by litigation-happy defense tactics. The meters in the law offices were running, but fee shifting was not warranted in this case.
 
 
 68
 Under section 1988 a court may award attorney's fees to a prevailing defendant if the court finds that the plaintiff's action is "frivolous, unreasonable, or without foundation." Christiansburg Garment Co. v. Equal Employment Opportunity Commission, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). See also Hughes v. Rowe, 449 U.S. 5, 14-16, 101 S.Ct. 173, 178-179, 66 L.Ed.2d 163 (1980) (applying Christiansburg to 42 U.S.C. Sec. 1983 case). In Jensen v. Stangel we held that denials of motions to dismiss and summary judgment may suggest that a plaintiff's claims are not without merit. 762 F.2d 815, 818 (9th Cir.1985). While defendants are correct in noting that in Jensen we reversed the attorney's fees award primarily upon other grounds, Jensen nevertheless, provides guidance.
 
 
 69
 As in Jensen, two trial judges presided over different parts of these proceedings. By denying many of defendants' motions for summary judgment, Judge Hill apparently believed that parts of the plaintiffs' case had enough merit to proceed to the next stage of litigation. Judge Kenyon, after hearing 39 days of trial, found that most of the claims were not proven or were otherwise barred. Logic and fairness dictate that where two judges disagree, attorney's fees should not be awarded en gross for bringing a frivolous case.
 
 
 70
 Massive fee awards against plaintiffs who continue to trial are contrary to Congress' goal of "promoting vigorous prosecution of civil rights violations under Title VII and Sec. 1983." Miller v. Los Angeles County Bd. of Educ., 827 F.2d 617, 619 (9th Cir.1987). We therefore reverse the district court's award of attorney's fees. To the extent that the City had to finance heavy defense costs, there is abundant evidence in this record that the City could have avoided much of the problem by employing a less confrontational approach to departmental grievances after having recently been through, and losing, the LULAC litigation.
 
 
 71
 We need not address whether the allocation of the burden of the fee award was an abuse of discretion because we hold that no award was warranted.
 
 
 72
 The district court abused its discretion in denying attorney's fees to Sanchez. A plaintiff in a civil rights suit is a prevailing party and is entitled to an award of attorney's fees if he "has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit.' " Texas State Teachers Ass'n v. Garland Independent School Dist., 489 U.S. 782, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989). We remand to the district court to award reasonable attorney's fees, including fees on appeal, in connection with that part of the verdict affirmed in the City's companion appeal, Sanchez v. City of Santa Ana, 915 F.2d 424 (9th Cir.1990). The district court shall determine the amount of fees that can be attributed to the part of Sanchez's appeal that was successful, and shall award reasonable attorney's fees and costs to the extent of Sanchez's success, both for the work in the district court and on appeal.
 
 
 73
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 *
 Judge Irving Hill, District Judge, for the Central District of California, presided over many of the pretrial orders
 
 
 [1]
 On June 13, 1978, Sanchez filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission (EEOC). On May 17, 1978, Torres filed a similar charge with the EEOC. On March 7, 1978, Caro also filed a charge with the EEOC. Plaintiffs received a right-to-sue letter from the U.S. Department of Justice on April 11, 1979 and timely instituted this civil action in federal district court on May 18, 1979. See 42 U.S.C. Sec. 2000e
 
 
 [2]
 Defendants Collins, Dittus, Faust, Lanner and McDaniel
 
 
 [3]
 A motions panel of this court previously ruled that this court has jurisdiction over the plaintiffs' appeal. While this court gives deference to motions panel decisions made in the course of the same appeal, we have an independent duty to decide whether we have jurisdiction. See Schlegel v. Bebout, 841 F.2d 937, 941 (9th Cir.1988)
 
 
 [4]
 Rule 54(b) provides in part: "When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."
 
 
 [5]
 The defendants contend that the district court did not have the authority to correct the judgment under Rule 60(a) because the rule may not be used to correct substantial errors. By "substantial" errors, the court means non-clerical errors; it is not referring to the magnitude of the error. Waggoner, 743 F.2d at 644-45. Because the district court's error was clerical, it was within the district court's power to correct the judgment under 60(a)
 
 
 [6]
 Officers hired laterally from other police departments enter as "step C" employees as compared to rookie police officers who enter at "step A." Advancement to steps D and E is based on merit
 
 
 [7]
 Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin" 42 U.S.C. Sec. 2000e-2(a)(1) (1988)
 
 
 [8]
 In this appeal, we do not consider Sanchez's claims of retaliation for first amendment protected activity where the alleged retaliation is poor reviews and the removal of his merit pay. These claims are the same as those for which he received a jury verdict. See Sanchez v. City of Santa Ana, 915 F.2d 424, 426-28, 430-31 (9th Cir.1990)
 
 
 [9]
 Our decision to vacate the award of $500,000 for emotional distress injury because it is barred by principles of res judicata, see Sanchez, 915 F.2d at 431-32, does not affect our decision here
 
 
 [10]
 Plaintiffs also allege that Chief Davis lied about the handling of the Caro matter when he testified in the state proceedings and that Lieutenant Williams inflated his state court testimony of Caro's excessive force charge. Neither of these incidents, however, evidence a conspiracy between two or more SAPD members